U.S. DISTRICT COURT EAST DIST. WISC.
FILED GREEN BAY DIV.
MAY - 2 2005
AT \_\_\_\_ O'CLOCK \_\_\_\_ M
SOFRON B. NEDILSKY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

   Plaintiff,

v.              Case No. 04-CR-241

JIAN GUO QU,

   Defendant.

## PLEA AGREEMENT

1. The United States of America, by its attorneys, Steven M. Biskupic, United States Attorney for the Eastern District of Wisconsin, and Michelle L. Jacobs, Assistant United States Attorney, and the defendant, Jian Guo Qu, individually and by attorneys Stephen Hurley and Marcus Berghahn, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2. The defendant has been charged in eight counts of an eight-count superseding indictment which alleges violations of 18 U.S.C. §§ 2, 371, 1956(a)(2)(A), 1956(h); 50 U.S.C. § 1705(b); 15 C.F.R. §§ 764.2(a), 764.2(g); and related forfeiture provisions.

3. With the assistance of a translator, the defendant has read and fully understands the charges contained in the superseding indictment and fully understands the nature and elements of the crimes with which he has been charged and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to Count One, set forth in full as follows:

### COUNT ONE: Conspiracy

1. Between on or about August 1, 1991, and on or about September 30, 2004, beginning in California and continuing in the State and Eastern District of Wisconsin, and elsewhere,

**NING WEN (a/k/a Wen Ning);**
**HAILIN LIN (a/k/a Lin Hailin);**
**JIAN GUO QU (a/k/a Qu Jian Guo); and**
**RUO LING WANG (a/k/a Wang Ruo Ling)**

*did knowingly conspire among themselves and with persons known and unknown to the grand jury, to commit offenses against the United States by violating export restrictions in the shipment of items to the People's Republic of China (hereafter "PRC").*

### Export Restrictions

2. The conspiracy included willful violations of the following statutes, regulations, and presidential orders:

a) The Export Administration Act of 1979 (hereafter "EAA"), as amended, Title 50, United States Code, Appendix, section 2401 et. seq.;
b) Title 50, United States Code, section 1705(b);
c) Export Administration Regulations (hereafter "EAR"), Title 15, Code of Federal Regulations (hereafter "C.F.R."), Parts 730-774);
d) Presidential Executive Orders under the International Emergency Economic Powers Act (Title 50 United States Code, sections 1701-1706 (1991 and Supp. 1999)) (otherwise known as "IEEPA"), including Executive Order 12924 (3 C.F.R., 1994 Comp. 917 (1995)), extended by Presidential Notices of August 15, 1995 (3 C.F.R., 1995 Comp. 501 (1996)), August 14, 1996 (3 C.F.R., 1996 Comp. 298 (1997)), August 13, 1997 (3 C.F.R., 1997 Comp. 306 (1998)), August 13, 1998 (3 C.F.R., 1998 Comp. 294 (1999)), and August 10, 1999 (64 Fed. Reg. 44101 (August 13, 1999)), all of which invoked his authority under IEEPA to continue the EAR in effect during a lapse of the EAA on August 20, 1994; and Executive Order 13222 of August 17, 2001 (3 C.F.R., 2001 Comp., p. 783 (2002)), as extended by the Notice of August 7, 2003 (68 Fed. Reg. 47833, August 11, 2003), and the Notice of August 6, 2004, (69 Fed. Reg. 48763, August 10, 2004), which continued the EAR in effect under IEEPA.

3. The combined effect of the above-listed legal provisions was to provide the public with a list of "restricted" items that could not be exported from the United States to certain countries, including the PRC, without express authorization from the government of the United States through an export license.

4. The above-listed legal provisions also imposed disclosure requirements on all exports to the PRC, including the requirement to file a "Shipper's Export Declaration" if the item required an export license and/or the value of an export exceeded $2,500.

### Object of the Conspiracy

5. As part of the conspiracy, the defendants sought to export restricted items from the United States to the PRC in violation of these laws by willfully:

> a) failing to obtain the proper export licenses for certain shipments;
> b) providing false descriptions and/or withholding required information on the invoices provided to the shippers;
> c) concealing the ultimate destination for certain items;
> d) understating the value of certain shipments to avoid disclosure obligations for values exceeding $2,500.

### Background and Identification of the Defendants

6. Defendant Ning Wen was born in the PRC. From approximately 1987 through 1992, he worked at PRC consulates in California. Thereafter and continuing through to the date of this Indictment, Wen moved to and resided in Manitowoc, Wisconsin. Wen became a United States citizen in 2000.

7. Defendant Hailin Lin is the wife of Ning Wen. She also was born in the PRC. She became a United States citizen in 2001.

8. In approximately 1992, Wen and Lin formed Wen Enterprises for the purpose of obtaining and exporting semiconductor products. Wen Enterprises was primarily operated out of their home in Manitowoc, Wisconsin.

9. Jian Guo Qu is a male citizen and resident of the PRC.

10. Ruo Ling Wang is the wife of Qu and a resident of the PRC.

11. Qu and Wang are employees at the Beijing Rich Linscience Electronics Company (hereafter "BRLE") in Beijing, PRC.

3

## Description of the Conspiracy

12. Beginning in approximately 1991, while still living and working in California, Wen began sending computer chips, some of which he was informed were restricted items, from the United States to Qu in the PRC.

13. According to records kept by Wen, the items were sent surreptitiously, using third parties who personally carried the parts from the United States to the PRC.

14. After Wen and Lin moved to Manitowoc, the process among the conspirators became more formalized and generally involved the following pattern:

   a) Qu, Wang and others at BRLE collected orders from others in the PRC for the purchase of semi-conductor and other electronic components. These orders would then be communicated to Wen Enterprises via facsimile and telephone calls.
   b) Lin obtained price quotes on these components from United States suppliers. The price quotes were communicated to Qu, Wang and others at BRLE.
   c) Lin purchased the ordered components from the United States sources and had them shipped to Manitowoc. The orders included both restricted and unrestricted items.
   d) Lin repackaged the items before shipping them to BRLE. As part of obtaining, repackaging and shipping items to the PRC, Lin knowingly and willfully:

   > (i) failed to obtain the proper export licenses for certain shipments;
   > (ii) provided false descriptions and/or withheld required information on shipping invoices;
   > (iii) concealed the ultimate destination for certain items;
   > (iv) understated the value of certain shipments to avoid having to file Shipper's Export Declarations.

15. Qu and Wang were aware that the exports involved fraudulent acts undertaken by Lin. At various times during the conspiracy, the conspirators discussed among themselves the nature of the false documentation and how to avoid detection.

16. In order to pay for the items to be exported, Qu arranged for payments to be made to Wen Enterprises using sources other than BRLE. The sources included the China National Packaging Base Construction Company, which was located in the PRC; and an individual, Ms. Tsui Kan, located in Hong Kong.

17. Lin and Wen consulted during the time period of the conspiracy regarding the export business, Lin's role, and the payments from Qu.

4

18. During the time period of the conspiracy, from January 2002, through September 2004, approximately $1.9 million was transferred from these sources to a bank account of Wen Enterprises in Manitowoc.

19. Wen and Lin shared the net profit from these transactions.

### Acts in Furtherance of the Conspiracy

20. On or about the following dates, in the State and Eastern District of Wisconsin and elsewhere, Hailin Lin did cause the following shipments to be sent from the United States to the PRC without the required export license.

|    | **Date**       | **Restricted Part Number** | **Quantity** |
|----|----------------|-----------------------------|--------------|
| a) | July 20, 2002  | SPT7760AIK                  | 4            |
| b) | June 27, 2003  | SPT7722SIT                  | 13           |
| c) | Mar. 14, 2003  | SPT7721SIT                  | 2            |
| d) | Feb.10, 2004   | SPT7722SIT                  | 16           |
| e) | June 6, 2004   | SPT7722SIT                  | 16           |
| f) | Sept. 3, 2004  | SPT7760AIK                  | 2            |

21. On or about the following dates, in the State and Eastern District of Wisconsin and elsewhere, Hailin Lin did cause the following shipments to be sent from the United States to the PRC. The shipments included false representations regarding the true value of the shipments:

|    | **Date**      | **Price Reported** | **Actual Price** |
|----|---------------|--------------------|-------------------|
| a) | May 21, 2004  | $2,469.50          | $11,328.70        |
| b) | July 16, 2004 | $2,427.50          | $10,450.20        |

22. On or about June 3, 2004, in the State and Eastern District of Wisconsin, and elsewhere, Hailin Lin conducted a telephone conversation with an employee of BRLE wherein Lin discussed attempting to obtain a restricted item.

23. On or about July 6, 2004, in the State and Eastern District of Wisconsin, and elsewhere, Hailin Lin conducted a telephone conversation with Ning Wen wherein they discussed methods to avoid detection.

24. On or about July 15, 2004, in the State and Eastern District of Wisconsin, and elsewhere, Hailin Lin conducted a telephone conversation with Jian Guo Qu wherein Qu cautioned Lin about the extent of the false information on the shipping documents, so as to avoid law enforcement detection.

25. On or about September 1, 2004, in the State and Eastern District of Wisconsin, and elsewhere, Hailin Lin conducted a telephone conversation with Ruo

*Ling Wang wherein Wang discussed with Lin the need to use letter mail to export an item so that it would not "go through customs."*

*All in violation of Title 18, United States Code, section 371.*

5. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph four (4). The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts set forth in Attachment A beyond a reasonable doubt. The defendant admits to these facts and that these facts establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of or participation in this offense.

## PENALTIES

6. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum penalties: five years' imprisonment, a $250,000 fine, and three years of supervised release. The count also carries a mandatory special assessment of $100.00.

7. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF REMAINING COUNTS

8. The government agrees to move to dismiss the remaining counts of the superseding indictment at the time of sentencing as to defendant Qu.

## ELEMENTS

9. The parties understand and agree that in order to sustain the charge of conspiracy to violate the United States export laws, as set forth in Count One, the government must prove each of the following propositions beyond a reasonable doubt:

<u>First</u>, that the conspiracy as alleged in Count One existed;
<u>Second</u>, that the defendant knowingly or intentionally joined the conspiracy; and
<u>Third</u>, that during the conspiracy, at least one of the coconspirators committed an act in furtherance of the conspiracy.

## SENTENCING PROVISIONS

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph four (4). The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties

7

Case 1:04-cr-00241-WCG    Filed 05/02/05    Page 7 of 17    Document 140

acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of defendant's criminal history.

## Sentencing Guidelines Calculations

14. The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Base Offense Level

15. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count one is 26 under Sentencing Guidelines Manual § 2M5.2(a)(1)(A).

## Acceptance of Responsibility

16. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as

8

authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

17. Both parties reserve the right to apprise the district court and the probation office of any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

18. The government agrees to recommend a sentence within the applicable guideline range, and agrees that the defendant is free to recommend a sentence below the applicable guideline range.

19. Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

## Court's Determinations at Sentencing

20. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph six (6) above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

21.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

22.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

### Fine

23.     The parties agree to recommend to the sentencing court that a fine of $2,000 be imposed against the defendant.

### Special Assessment

24.     The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

### Forfeiture

25.     The defendant acknowledges that he has no right, title or interest in any of the property named in the forfeiture provision of the superseding indictment.

## DEFENDANT'S WAIVER OF RIGHTS

26.     In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

>    a.      If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.  If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.  At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.  At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

27. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

28. The defendant acknowledges and understands that he will be adjudicated guilty of each offense to which he will plead guilty and thereby may be deprived of certain rights, including

but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

29. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

30. In the event that the court imposes a sentence of no more than 48 months, the defendant knowingly and voluntarily waives his right to appeal his sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. This waiver, made in exchange for the government's concessions contained in this agreement, does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, and (3) ineffective assistance of counsel.

### Further Civil or Administrative Action

31. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

12

## GENERAL MATTERS

32. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

33. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

34. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

13

35. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

14

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: May 2, 2005

*Qu Jian Guo*
JIAN GUO QU
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: May 2, 2005

STEPHEN HURLEY
MARCUS BERGHAHN
Attorneys for Defendant

For the United States of America:

Date: 5-2-05

STEVEN M. BISKUPIC
United States Attorney

Date: 5-2-05

MICHELLE L. JACOBS
Assistant United States Attorney

## ATTACHMENT A - FACTUAL BASIS FOR PLEA OF GUILTY

Beginning in the early 1990s, and continuing until September 30, 2004, Jian Guo Qu was engaged in the business of importing into China integrated circuits (IC) and other computer chips and electronic components for customers/end-users in China. Mr. Qu's business, called Beijing Rich Linscience Electronics ("BRLE"), is based in Beijing, China. BRLE employed several persons in the business, including Mr. Qu's wife, Ruo Ling Wang, and Mr. Qu's sister.

BRLE's primary overseas source for IC parts and other electronic components was Wen Enterprises, a business that began in California and later moved to Manitowoc, WI. Wen Enterprises was established by Ning Wen in August 1991, while Wen was employed in the Science and Technology Branch of the Chinese Consulate in Los Angeles. Wen operated the business by himself from 1991 through 1993, obtaining and exporting both export controlled and non-controlled parts to Mr. Qu in Beijing. Thereafter, Mr. Wen transferred the day-to-day operations of the business to his wife, Hailin Lin. Ms. Lin continued to conduct the day-to-day operations, in consultation with Mr. Wen, Mr. Qu, Ms. Wang and others, until September 30, 2004.

Business conducted between BRLE and Wen Enterprises was done primarily by fax, with some business also conducted by telephone and e-mail. The business typically worked as follows. Ms. Wang, Mr. Qu and others at BRLE would develop customers ("end-users") in need of IC components. Those customers included state-owned, military, and commercial (private) businesses in China. When customers identified parts that they wished to purchase from BRLE, Ms. Wang, Mr. Qu or others at BRLE requested price quotations for those parts from Wen Enterprises. Mr. Wen, and later Ms. Lin, would locate United States distributors for the parts and provide a price quotation to BRLE. If the price was acceptable, BRLE employees would notify Wen Enterprises that it wished to purchase the part. Mr. Wen or Ms. Lin would then order the part from a United States distributor, have it shipped domestically to Wen Enterprises, consolidate the parts for shipment to BRLE in China, and export the parts to BRLE.

Through the 1990s and into early 2004, Wen Enterprises regularly exported to BRLE parts that were export-controlled; in other words, the United States government controlled the export of these parts for national security reasons by requiring exporters to obtain an export license for export to certain, designated countries.

In the early years of the conspiracy, Ning Wen obtained both controlled and non-licensable parts and had them "hand carried" to China to BRLE and Mr. Qu without obtaining the required export licenses.

After Wen left the consulate and when Lin took over the day-to-day operations of the business, Wen Enterprises no longer had items hand-carried to China, but instead used shippers such as UPS and DHL. Ms. Lin received assistance from one distributor, Sci Teq, to apply for a license for certain frequency synthetizers, but the export license was denied because of the Chinese military applications for such parts. Other than that one license attempt, Ms. Lin obtained IC parts and exported them to Mr. Qu without obtaining or even attempting to obtain the requisite export license.

16

Some of those shipments containing controlled parts are described in Count One, Paragraph 20(a)-(f), and Counts Two and Three.

Beginning in March 2004, Ms. Lin learned that completion of a Shipper's Export Declaration ("SED") would be required for each shipment with a value of $2,500 or more. Additionally, UPS informed Ms. Lin that it would no longer complete an SED for her, and instead, she would be required to complete the SED for each shipment. Finally, Ms. Lin was notified by an e-mail from a United States distributor, that Wen Enterprises had exported parts to BRLE which had required export licenses from the Department of Commerce because the parts were controlled for national security reasons. This information was communicated to Mr. Qu and others at BRLE, but despite obtaining this information, Ms. Lin continued to purchase and export licensable parts to BRLE without the requisite export licenses.

Because the SED required that Ms. Lin report export license information, and because licenses were not being obtained for parts that otherwise required a license, Ms. Lin and Mr. Qu agreed that Ms. Lin would begin to falsify shipping invoices for shipments with a value over $2,500. Ms. Wang was aware of this agreement and thereafter participated in shipments involving false invoices.

Beginning at least by April 2004, and consistent with their agreement, Ms. Lin began to reflect that every shipment of parts exported from Wen Enterprises to BRLE had a value of under $2,500. Four such shipments are listed in Count One, Paragraph 21(a)-(b), and in Counts Four and Five. Ms. Lin would prepare a dummy or "unofficial" invoice wherein she would reduce the prices of some parts and would omit others from the invoice in order to cause the value of the shipment to drop below $2,500. The "unofficial" invoice was then used as the shipping invoice that Ms. Lin would include in paperwork provided to the shipper (such as UPS or DHL) for the shipment. These false statements and concealment of the true values of the shipments each time caused the shipper not to require that an SED be prepared or filed with the United States, and thus the actual value of the shipment and its contents were concealed from the United States Customs Service and the Department of Commerce, Bureau of Industry and Security.

When Ms. Lin sent the parts to BRLE with a false "unofficial" shipping invoice, she would also fax a group of documents to BRLE which Mr. Qu and others at BRLE would review and use in their business. Included in the fax would be the "unofficial" invoice and the accurate ("official") invoice which included all parts at their correct prices. Mr. Qu and the other BRLE employees would rely on the official invoice to verify that they had received all of the order and to sort the parts for forwarding on to their clients/end-users in China.

To pay for the items that Wen Enterprises exported to Beijing Rich, Mr. Qu and others at BRLE would arrange for payments to be wire transferred to Wen Enterprises, using sources in China including the China National Packaging Base Construction Company and others. From January 2002 through September 2004, approximately $1.9 million was transferred by Mr. Qu and BRLE, through sources in China and Hong Kong, to a bank account of Wen Enterprises in Manitowoc, WI.

17